**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

———————

No. 14-1734

———————


LAURA FABBRO; DRX HAMILTON, LLC; FABBRO ENTERPRISES, LLC;
FABBRO FINANCIAL MANAGEMENT, INC.,
Appellants

v.

DRX URGENT CARE, LLC; AMERICAN FAMILY CARE;
JOHN DOES 1-10; ABC CORP. 1-10M


———————

No. 14-1735

———————


SURENDRA PAI; NEXDRX1 LLC;
NEXETRA CORP.,
Appellants

v.

DRX URGENT CARE, LLC; AMERICAN FAMILY CARE;
RHINO 7 FRANCHISE DEVELOPMENT CORPORATION;
JOHN DOES 1-10; ABC CORP. 1-10M


———————

On Appeal from the District Court
for the District of New Jersey
(D.C. Civil No. 3-13-cv-03558)
(D.C. Civil No. 3-13-cv-04333)
(Honorable Joel A. Pisano)

Submitted Pursuant to Third Circuit LAR 34.1(a)
March 6, 2015

Before: SHWARTZ, SCIRICA, and ROTH, Circuit Judges

(Opinion Filed:  April 1, 2015)

_____

OPINION[*]

_____

**SCIRICA**, *Circuit Judge*.

Plaintiffs, Doctors Express franchisees Laura Fabbro and Surendra Pai (and their associated entities),[1] appeal the Federal Rule of Civil Procedure 12(b)(6) dismissal of their claims for violation of the New Jersey Franchise Practices Act; breach of contract; breach of the implied covenant of good faith and fair dealing; common law fraud; negligent misrepresentation; and violation of the Maryland Franchise Registration and Disclosure Law. Plaintiffs allege that Doctors Express Franchising, LLC ("DEF"), creator of the Doctors Express franchise, misrepresented initial startup costs and capital requirements in its financial disclosure documents. They allege their costs exceeded

---

[*] This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

[1] The plaintiffs sued separately, but, as the District Court explained, the "nearly-identical Complaints," drafted by "the same counsel," "involve the same franchisor, the same franchising system, and identical claims against the same defendants." *Pai v. DRX Urgent Care, LLC*, Nos. 13-3558 & 13-4333, 2014 WL 837158, at *1 (D.N.J. Mar. 4, 2014).

DEF's estimates by a substantial margin, and that DEF and the current franchisor, DRX, made deleterious system-wide changes, such as changes in required vendors and company leadership. Further, they contend DRX refused to provide a formal, audited accounting of the fund used to advertise and market the franchise. We will affirm.[2]

First, plaintiffs' breach of contract claims fail because, as the District Court correctly observed, "Plaintiffs have failed to cite to a single provision of the Franchise Agreement that has been breached." 2014 WL 837158, at *10.[3] The figures challenged were expressly estimates based "on the experience and data collected from [an] affiliate that operates an urgent care center (in Maryland)," with the caveat that a franchisee's "costs will depend on a number of factors including local economic and market conditions." App. 169, 355; *see* App. 166, 352 ("ESTIMATED INITIAL INVESTMENT"). Plaintiffs have not articulated why "grossly understating the initial

---

[2] The District Court had diversity jurisdiction under 28 U.S.C. § 1332(a). We have appellate jurisdiction under 28 U.S.C. § 1291. We assume as true the well-pleaded, nonconclusory factual allegations in plaintiffs' complaints, and draw all reasonable inferences therefrom. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). In addition, we consider the relevant franchise agreements and disclosure documents that were attached to or explicitly referenced in plaintiffs' complaints. *E.g.*, *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010); *Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993).

[3] For instance, under the Franchise Agreements (and contrary to plaintiffs' allegations), the franchisor "reserve[d] the right" to choose "suppliers and distributors," App. 86, 268, even if that required plaintiffs "to invest additional capital . . . and/or incur higher operating costs," App. 89, 271, as well as the right to change officers, App. 95, 276-77. Further, the franchisor obligated itself to provide "an annual, unaudited statement of Marketing Fund collections and expenses" that it "may," but need not, "have audited annually." App. 91, 273. For this reason, as the District Court observed, *see* 2014 WL 837158, at *11, plaintiffs' claim for accounting (and for breach of contract, insofar as premised on the franchisor's unaudited statement of the Marketing Fund) fails.

start-up costs and capital investment required as well as operating 'working capital'" constitutes a breach of contract. Similarly, plaintiffs' claim for breach of the implied covenant of good faith and fair dealing fails under either Maryland or New Jersey law.[4] Maryland does not recognize such an independent cause of action,[5] and while New Jersey does, "'bad motive or intention is essential,' and 'an allegation of bad faith or unfair dealing should not be permitted to be advanced in the abstract and absent improper motive.'" *Elliott & Frantz, Inc. v. Ingersoll-Rand Co.*, 457 F.3d 312, 329 (3d Cir. 2006) (quoting *Wilson v. Amerada Hess Corp.*, 773 A.2d 1121, 1130 (N.J. 2001)). We are unable to find any allegations in the plaintiffs' complaints (nor do plaintiffs direct us to any) "to demonstrate, or from which to infer, bad motive or intention." *Id.* "[A] party does not breach the implied covenant of good faith and fair dealing merely because its decisions disadvantaged another party, and 'contract law does not require parties to behave altruistically toward each other.'" *Id.* (quoting *Wilson*, 773 A.2d at 1130). As here, "[a]bsent bad motive or intention, decisions a contract expressly permits which happen to result in economic disadvantage to the other party are of no legal significance." *Id.*

---

[4] It is unclear which state's law plaintiffs think should apply, *see* 2014 WL 837158, at *9 n.4, but the choice is immaterial to the result.

[5] *Nielsen Enters. MD, LLC v. U.S. Bank Trust Nat'l Ass'n*, 55 F. App'x 189, 190 (4th Cir. 2003) (nonprecedential); *Marland v. Safeway, Inc.*, 65 F. App'x 442, 449 (4th Cir. 2003) (nonprecedential) (citing and "agree[ing] with the weight of . . . authority that no independent cause of action of this type is recognized in Maryland").

4

Second, because the alleged misrepresentations were not actionable, the common law fraud and negligent misrepresentation claims were also properly dismissed. Predictions or promises regarding future events—such as the expenses involved in starting a Doctors Express franchise—are necessarily approximate. In Maryland, "the general rule is that predictions or 'statements which are merely promissory in nature and expressions as to what will happen in the future are not actionable as fraud.'" *Miller v. Fairchild Indus., Inc.*, 629 A.2d 1293, 1302 (Md. Ct. Spec. App. 1993) (quoting *Finch v. Hughes Aircraft Co.*, 469 A.2d 867, 888 (Md. Ct. Spec. App. 1984)). "Under New Jersey law, statements as to future events, expectations, or intended acts, do not constitute misrepresentations despite their falsity, if the statements were not made with the intent to deceive," and "[m]ere nonperformance is insufficient to show that the promisor had no intention of performing." *Notch View Assocs. v. Smith*, 615 A.2d 676, 682 (N.J. Super. Ct. Ch. Div. 1992).

Plaintiffs contend, however, that "a statement that is in form a prediction or promise as to the future course of events may justifiably be interpreted as a statement that the maker knows of nothing which will make the fulfillment of his prediction or promise impossible or improbable." *Restatement (Second) of Torts* § 525 cmt. f. (1977). But even leaving the conditions imposed by Federal Rule of Civil Procedure 9(b) to one side (as they may apply to plaintiffs' allegations of oral representations), plaintiffs, as the District Court reasoned, "have alleged no facts in the Complaint[s] that the initial cost estimates were inaccurate at the time they were made or that the Defendants believed or knew the estimates to be false." 2014 WL 837158, at *12; *cf., e.g.*, *Anderson v. Modica*, 73 A.2d

5

49, 53 (N.J. 1950) ("'Malice, intent, knowledge, and other condition of mind of a person may be averred generally', but they must still be averred." (citation omitted)).[6] Instead, plaintiffs' allegations, when they do not contradict statements in the relevant financial disclosure documents,[7] ignore the manifest nature of what are explicitly estimates. *See,*

[6] *Cf. also, e.g.*, *Kelly Tire Serv., Inc. v. Kelly-Springfield Tire Co.*, 338 F.2d 248, 253 (8th Cir. 1964) ("[T]he evidence does not demonstrate that defendant had any knowledge when these annual forecasts of plaintiff's business were prepared and presented to it that the estimated levels of sales and profits could not be attained. . . . At best, these projections, however persuasive in shaping plaintiff's plans, were opinions subject to the uncontrollable economic influences of free enterprise and not fraudulent misrepresentations of past or existing facts on which plaintiff justifiably relied to its detriment."). Further, regardless of whether we would agree with the cases to which plaintiffs cite, we find them distinguishable. For instance,

> [t]he court in *Motor City Bagels* found that there was a genuine issue of material fact regarding whether there was an actionable misrepresentation claim . . . based largely on the fact that an updated offering prospectus existed—the data was calculated, the estimates increased, and the document was filed with the state—that might not have been provided to the plaintiffs.

*A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, --- F. Supp. 3d ----, ----, No. 12-1117, 2014 WL 4852095, at *18 (D.D.C. Sept. 30, 2014) (citing *Motor City Bagels, LLC v. Am. Bagel Co.*, 50 F. Supp. 2d 460, 466-71 (D. Md. 1999)); *see Motor City Bagels*, 50 F. Supp. 2d at 473 ("[T]he plaintiffs have presented evidence of a false representation of a material, pre-existing fact: assuming that the plaintiffs did not receive an updated copy of American Bagel's UFOC in November 1994, then the cost information contained in the disclosure document was not 'based on the latest available data' as the defendants had represented."). Here, we find no nonconclusory, well-pleaded allegation that DEF's estimates were based on anything other than the historical experience of its Maryland affiliate. *Cf. also, e.g.*, *A Love of Food I, LLC v. Maoz Vegetarian USA, Inc.*, 795 F. Supp. 2d 365, 376-77 (D. Md. 2011) (noting that an important factor "that courts ought to consider in discerning whether faulty projections are actionable as fraud" is "whether the cost projection is contrary to any facts within the defendant's possession").

[7] In fact, the disclosure documents belie plaintiffs' allegation that the working capital range was misrepresented because it omitted the medical director's salary, App. 39, 215. *See* App. 196 ("We estimate that if the Baltimore Center was not owned by a physician,

*e.g.*, App. 169, 355 ("This is an estimate only for the additional operating capital . . . . We cannot guarantee that you will not have additional expenses starting the business. . . . In compiling these estimates, we have relied on the experience and data collected from our affiliate that operates an urgent care center (in Maryland). Your costs will depend on a number of factors including local economic and market conditions. . . ."). Accordingly, given plaintiffs' allegations, we are constrained to affirm the dismissal of plaintiffs' fraud and negligent misrepresentation claims.[8] "To hold otherwise would likely transform annual reports and advertisements into sources of endless litigation." *Miller*, 629 A.2d at 1303.

Third, we agree with plaintiffs that the Supreme Court's decision with regard to the federal Petroleum Marketing Practices Act ("PMPA") in *Mac's Shell Service, Inc. v. Shell Oil Products Co. LLC*, 559 U.S. 175 (2010), is not controlling authority for interpreting the New Jersey Franchise Practices Act, N.J. Stat. Ann. §§ 56:10-1 to 56:10-15 ("NJFPA"). But the distinction, for purposes of plaintiffs' constructive termination

---

that the additional cost for the staff physician would have been $124,000 . . . ."); App. 383. Plaintiffs also claim that "Defendants' [sic] stated that its [sic] figures were based upon experiential data gleaned from other franchises operating in the system when there were not yet any franchises upon which to base this analysis." App. 60. To the contrary, the disclosure documents specifically noted, "In compiling these estimates, we have relied on the experience and data collected from our affiliate that operates an urgent care center (in Maryland)." App. 169, 355.

[8] *See, e.g.*, *Miller*, 629 A.2d at 1304 ("A negligent misrepresentation claim based on statements promissory or predictive in nature, however, suffers the same fate as a deceit claim based on such statements. . . . [A]ny promise that is made with the present intention not to perform or any prediction that is made with present knowledge that the predicted event will not occur is, perforce, an intentional misrepresentation, not a negligent one, and thus cannot sustain an action for negligent misrepresentation.").

7

claims, is without a difference. Even to the extent the New Jersey Supreme Court would follow *Maintainco, Inc. v. Mitsubishi Caterpillar Forklift America, Inc.*, 975 A.2d 510, 512 (N.J. Super. Ct. App. Div. 2009), over the reasoning in *Mac's Shell*, the allegations here are insufficient.[9]

In *Maintainco*, the court held that "'termination' in the [NJFPA] includes constructive termination in accordance with traditional contract law principles." 975 A.2d at 520. The context for that holding was the court's inquiry into "whether the record supports the trial court's finding that defendant's conduct breached the franchise agreement and constituted an attempt to terminate the contract." *Id.* at 512. The court found constructive termination because the "defendant's conduct was geared to terminating plaintiff's [forklift] franchise, and, but for plaintiff's filing of this action, defendant would have succeeded." *Id.* at 518. The defendant had sent letters to a plaintiff's customers designating a competitor as its favored dealer and failing to mention plaintiff, *id.* at 517, and proposed to "eliminate[] plaintiff as a dealer by ending its ability to purchase new forklifts and parts," *id.* at 521. The court also thought a letter from the defendant to the "plaintiff was a termination letter." *Id.* at 518. In short, the "[d]efendant

---

[9] When state law is unclear, "we must predict how the [highest] state court would resolve the[] issues should it be called upon to do so." *Wiley v. State Farm Fire & Cas. Co.*, 995 F.2d 457, 459 (3d Cir. 1993) (listing authority to be consulted). We also note, however, that several courts and commentators have opined that state franchise statutes should be interpreted no differently than the PMPA. *See, e.g.*, Robert K. Kry, Mac's Shell *and the Future of Constructive Termination*, 30 Franchise L.J. 67, 69 (2010) ("At its core, *Mac's Shell* rested on the simple notion that *terminate* means 'terminate,' not 'continue under undesirable conditions.' Or, as Yogi Berra might put it: 'It ain't over 'til it's over.' That common sense proposition is no less applicable to state franchise termination statutes than to the PMPA." (footnote omitted)).

attempted to establish [plaintiff's competitor] as the only viable dealer in the territory." *Id.* at 521.

Here, plaintiffs claim their franchises have been constructively terminated because "Defendants have made material changes to their business model that have harmed, rather than helped, franchisees. It is also alleged that Defendants' own incompetence, combined with stubborn management and strict requirements, have rendered the Pai Plaintiffs' seven-figure investment inoperable." Appellants' Br. 25-26. Plaintiffs' theory is that "various aspects of the Defendants' franchise business . . . are alleged, in the aggregate, to constitute a material re-write of the parties' original agreement and change of the franchisees' originally-contemplated business operations." *Id.* at 31. But even assuming plaintiffs' allegations are true, as we must, we have found no breach of contract or of any implied covenant, as we have explained above. Nor have plaintiffs alleged anything like the facts upon which *Maintainco* turned—that is, for example, the manifest intent of the defendant to cease doing business with plaintiffs (and, indeed, undermine plaintiffs' businesses) to the benefit of another dealer. We have found no allegations from which to reasonably infer DRX would want to terminate plaintiffs' franchises, and plaintiffs have identified none. To the contrary, plaintiffs have alleged that they have continually made weekly royalty payments to DRX and are "in good standing."

Finally, the District Court properly dismissed plaintiffs' claims under the Maryland Franchise Registration and Disclosure Law, Md. Code Ann., Bus. Reg. §§ 14-201 to 14-233, because, as is evident on the face of the pleadings, these claims were not

"brought within 3 years after the grant of the franchise," Md. Code Ann., Bus. Reg. § 14-227(e).[10]

For the foregoing reasons, we will affirm the dismissal of plaintiffs' complaints.

---

[10] Plaintiffs' arguments on appeal involve no contention that these claims were timely.